**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JEREMY R. DURHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-01172** |
| | ) | **Judge Aleta A. Trauger** |
| **LARRY MARTIN, in his official** | ) | |
| **capacity, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM

Before the court is the defendants' Motion to Dismiss (Doc. No. 35) Jeremy R. Durham's

Amended Complaint for Declaratory and Injunctive Relief (Doc. No. 33). For the reasons set

forth herein, the motion will be granted in part and denied in part.

## I.      Factual and Procedural Background

Plaintiff Jeremy Durham was elected to the 108th General Assembly of the Tennessee

House of Representatives in November 2012 and again in November 2014, for the 109th General

Assembly, where he served until his expulsion on September 13, 2016. (Am. Compl., Doc. No.

33 ¶¶ 6, 34.) As a result of the expulsion, Durham was removed from the House membership roll

before the end of the 109th General Assembly. (*Id.* ¶ 6.) He was later informed by the defendants

that his expulsion resulted in the termination of certain state benefits in which he claims he had a

vested interest. This lawsuit stems from the expulsion and ensuing events, in particular the denial

of the state benefits. Durham asserts that his expulsion violated Article 1, Section 10 of the

United States Constitution, which prohibits bills of attainder, and his right to due process under

the Fourteenth Amendment. He also claims it was in violation of state law. He alleges that the

unauthorized expulsion and bill of attainder led to further constitutional deprivations when his benefits were terminated. He brings suit to vindicate the federal constitutional violations under 42 U.S.C. § 1983, seeking his reinstatement on the membership roll of the 109th General Assembly and reinstatement of his state benefits.

As set forth in the Amended Complaint, the Tennessee Attorney General's Office issued a report in July 2016 on Durham's alleged "disorderly conduct" while in office. (Doc. No. 33 ¶ 35.)[1] Shortly thereafter, Representative Mike Stewart called for a special session vote to expel Durham. The stated purpose of the session was to ensure that Durham's lifetime pension would not vest in November. (*Id.*) House Majority Leader Gerald McCormick sponsored a petition in support of the special session. (*Id.* ¶ 38.) Only twenty-seven representatives signed the petition, as a result of which the call for a special legislative session failed. (*Id.*) House Republican Caucus Chair Glen Casada and Representative Joe Armstrong circulated a second petition to call a special legislative session to oust Durham. That petition failed as well. (*Id.* ¶ 40.)

On July 14, 2016, Durham announced at a press conference that he had withdrawn from the GOP primary for his seat in the upcoming term. On August 4, 2016, Sam Whitson won the GOP primary in Durham's district, thus ensuring that Durham would not be re-elected to serve a third term in the General Assembly. (*Id.* ¶ 42.) As of that date, there was no plan for the House of Representatives to convene again until after the election of the next General Assembly. Durham's service in the House was over, and he had "effectively retired from the legislature." (*Id.* ¶ 43.)

However, on September 2, 2016, then-Governor Bill Haslam issued a proclamation to

---

[1] Without making any findings of fact as to the truthfulness thereof, the court takes judicial notice that the Tennessee Attorney General's Office reported that Durham had sexually harassed at least 22 women between 2012 and 2016.

convene the Tennessee General Assembly for a special session. As set forth in the proclamation, the purpose of the special session was to "[c]onsider[] and act[] upon legislation necessary to ensure that Tennessee law prohibiting an individual under the age of 21 from operating a motor vehicle while intoxicated or under the influence of alcohol maintains compliance with 23 U.S.C. § 161" and, generally, to ensure compliance with federal law relating to federal-aid highway funding, in order for the State to avoid losing up to $60 million in federal highway funds. (Doc. No. 33 ¶¶ 10, 44; Proclamation, Doc. No. 33-1.)

The special legislative session was authorized by Article III, Section 9 of the Tennessee Constitution. (Doc. No. 33 ¶ 9.) That provision specifically empowers the governor, "on extraordinary occasions, [to] convene the General Assembly by proclamation, in which he shall state specifically the purposes for which they are to convene." Tenn. Const. art. III, § 9. On such occasions, the General Assembly "shall enter on no legislative business except that for which they were specifically called together." *Id.* In a press release dated September 2, 2016, Governor Haslam confirmed that an effort to expel Durham was not on the agenda for the special session. (Doc. No. 33 ¶¶ 11, 45.)

Nonetheless, on September 12, 2016, the first day of the special session, which Durham did not attend, Representative Susan Lynn gave notice that she intended to make a motion the next day to expel Durham from the House for "disorderly behavior." (*Id.* ¶¶ 14, 48.) Durham, notified by media reports about Lynn's announcement, attended the special session the following morning. (*Id.* ¶ 52.) That morning, as the House reconvened for the special session to deal with federal highway funds, Lynn introduced her motion and "debate ensued." (*Id.* ¶ 53.) Durham spoke on his own behalf, arguing that the action was unconstitutional and that he had not been accorded due process. (*Id.* ¶ 54.) The Tennessee House of Representatives nonetheless voted on

the motion and approved it by a margin of seventy votes in favor of expulsion to two against. Durham was not present for the vote. (*Id.* ¶ 56.) Durham was immediately expelled from the House of Representatives and his name was removed from the House membership roll. (*Id.* ¶¶ 16, 57.) Durham maintains that his expulsion violated state and federal law.

Shortly after his expulsion from the legislature, Durham inquired about the status of his state health insurance coverage. He was informed that, as a result of the vote to expel him on September 13, his insurance coverage as an active state employee would terminate on September 30, 2016, after which date he would be eligible for COBRA coverage. (*Id.* ¶¶ 18, 60–61; Doc. No. 33-2.) An email attached to the Amended Complaint, from Angie Gargara, Benefits Administration, to Tammy Rather, which the plaintiff claims was forwarded to him, states:

> The question of whether former Representative Durham is entitled to lifetime coverage as a retiree was decided by Commissioner Martin after consultation with the Attorney General's office. It is the Department's decision that expulsion from the General Assembly does not constitute "retirement" that the law requires for lifetime coverage, so Representative Durham is not entitled to that benefit. The Attorney General interpreted "retirement" to exclude expulsion in Attorney General Opinion 80-147.

(Doc. No. 33-2.)

In addition to the loss of his healthcare benefit, Durham claims that, "[a]s a direct and proximate result of his improper and unauthorized expulsion," he lost his state "pension and has been so informed by the State's Benefits Administration Division." (Doc. No. 33 ¶ 19.)

Based on these factual allegations, Durham originally filed suit in this court on August 21, 2017, naming as defendants Larry Martin, in his official capacity as Tennessee Commissioner of Finance and Administration; Connie Ridley, in her official capacity as Director of Legislative Administration; and David H. Lillard, Jr., in his official capacity as Treasurer of the State of Tennessee. The original Complaint asserted a single "Count": that the plaintiff had a

protected property interest in his state benefits and was denied due process through the deprivation of these benefits, based on his *ultra vires* expulsion from the House of Representatives. (Doc. No. 1.)

This court, construing the original Complaint as asserting a claim based on the plaintiff's unlawful expulsion from the legislature, dismissed the Complaint for lack of standing, as the named defendants did not participate in that action. The Sixth Circuit reversed and remanded, finding that the plaintiff Durham had standing to sue the administrators named as defendants, because the injuries he seeks to remedy are fairly traceable to the administrators' conduct, as he adequately alleged that he is not receiving benefits that the defendant administrators should pay. *Durham v. Martin*, 905 F.3d 432, 433 (6th Cir. 2018).

Following remand, the plaintiff was granted leave to amend his Complaint. In the Amended Complaint, he names four new defendants: Joe McCord, in his official capacity as the former Chief Clerk of the Tennessee House of Representatives; Victor Thompson, in his official capacity as the former Chief Sergent-At-Arms of the Tennessee House of Representatives; Tammy Letzler, in her official capacity as the current Chief Clerk of the Tennessee House of Representatives; and William C. Howse, in his official capacity as the current Sergent-At-Arms of the Tennessee House of Representatives.[2] (Doc. No. 33.)

The Amended Complaint includes a new cause of action as well. In Count I, Durham claims that his expulsion by the House of Representatives constituted a legislative action that punished him by taking away his vested health insurance and pension benefits without a judicial trial. He asserts that, as such, the action constituted a bill of attainder, which is expressly barred by Article I, Section 10 of the United States Constitution. He claims that the "defendants"—

---

[2] The State of Tennessee is also identified as a defendant in the Amended Complaint, but the claims against it have been dismissed by stipulation. (Doc. No. 45.)

without identifying which of them—deprived him of his constitutional right to not have a bill of attainder passed against him, a violation he seeks to vindicate under 42 U.S.C. § 1983. (Doc. No. 33 ¶¶ 62–72.)

In Count II, "Denial of Due Process," Durham asserts, as he had in the original Complaint, that he had a protected property interest in his state benefits and was deprived of those benefits without due process. (*Id.* ¶ 74.) He claims that, based on the plain language of Article III, Section 9 of the Tennessee Constitution and the prior failed attempts to call a special session for the specific purpose of expelling him, he had a reasonable expectation under state law that he would retain his state benefits (lifetime health insurance and a state pension) following the expiration of his term. (Doc. No. 33 ¶ 75.) He could not have anticipated a vote on his expulsion during the special session called to prevent the state's loss of federal highway funds, given that state law prohibited the legislature from conducting any other business during that session, and Durham's only notice of Representative Lynn's intent to make a motion to expel him was through the media's coverage of the special session. Durham alleges that he was not given a meaningful opportunity to be heard and was afforded no post-deprivation remedy to challenge his expulsion or the deprivation of his state benefits. He brings this claim under 42 U.S.C. § 1983 as well, claiming that the defendants, acting under color of state law, deprived him of his right to due process.

In his Prayer for Relief, Durham demands that the court issue (1) a declaration that the State of Tennessee's action, through the House's "illicit and unjustified expulsion" of him, constitutes an unconstitutional bill of attainder; (2) a declaration that he had a "potential property interest in his state benefits" that the defendants denied him without due process of law (Doc. No. 33, at 13); and (3) an injunction requiring the defendants to reinstate the plaintiff to the

House membership roll of the 109th General Assembly and to reinstate his state pension and health insurance coverage.

The defendants thereafter filed their Motion to Dismiss Amended Complaint and supporting Memorandum of Law, arguing that the dismissal is required under Rules 12(b)(1) and 12(b)(6) for lack of subject-matter jurisdiction and for failure to state a claim for which relief may be granted. (Doc. Nos. 35, 36.) The plaintiff has filed his Response in opposition thereto, and the defendants filed a Reply. (Doc. Nos. 40, 43.)

## II.     Legal Standards

### A.     Rule 12(b)(1)

A court's subject matter jurisdiction is a "threshold determination" that may be challenged by motion under Rule 12(b)(1). *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). "A Rule 12(b)(1) motion can either attack the claim of jurisdiction on its face, in which case all allegations of the plaintiff must be considered as true, or it can attack the factual basis for jurisdiction, in which case the trial court must weigh the evidence and the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

A facial attack "questions merely the sufficiency of the pleadings." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co*., 491 F.3d 320, 330 (6th Cir. 2007). In reviewing a factual attack, however, the court may consider evidence outside the pleadings, and both parties are free to supplement the record by affidavits. *Id. See Rogers v. Stratton Indus.*, 798 F.2d 913, 916 (6th Cir. 1986). A State's assertion of sovereign immunity constitutes a factual attack. *Hornberger v. Tennessee*, 782 F. Supp. 2d 561, 564 (M.D. Tenn. 2011).

**B.  Rule 12(b)(6)**

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)). The court must determine whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action"; instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**III.  Discussion**

The defendants' motion argues that (1) the claims against the newly added defendants are time-barred; (2) Count I of the Amended Complaint should be dismissed under Rule 12(b)(6), because the action of the Tennessee House of Representatives does not constitute a Bill of Attainder; (3) the plaintiff's due process claim is barred by the Eleventh Amendment; and (4) alternatively, even if the due process claim is not barred by immunity, it should be dismissed

under Rule 12(b)(6). The plaintiff opposes each of these arguments.

## A.    Statute of Limitations

The defendants argue, first, that the plaintiff's claims against the four newly named defendants—Joe McCord, Victor Thompson, Tammy Letzler, and William C. Howse—are barred by the statute of limitations and that those claims do not "relate back" under Rule 15(c)(1) of the Federal Rules of Civil Procedure.[3]

As an initial matter, the court notes that the Amended Complaint, in effect, names only two new defendants. That is because a claim against an official in his or her official capacity is, by definition, a claim against the official's office. A former official no longer holds the office and cannot be sued in his official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 166 n.11 (1985) ("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office." (citing Fed. R. Civ. P. 25(d))). Naming the former officials in their official capacity only, while also naming the current officials in their official capacity only, is therefore both improper and redundant, as the former officials are automatically replaced by their successors by operation of Rule 25.

Regarding the claims against the current officials, because Congress did not enact a statute of limitations for actions brought under 42 U.S.C. § 1983, federal courts look to state statutes of limitation to determine the appropriate limitations period. *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005). The one-year statute of limitations in Tenn. Code Ann. § 28-3-104(a)(3) applies to civil rights claims arising in

---

[3] The Amended Complaint also adds a new claim for relief under 42 U.S.C. § 1983, based on the theory that plaintiff's expulsion from the legislature was an unconstitutional bill of attainder. The defendants apparently concede that this claim relates back to the claims in the original Complaint and is not barred by the statute of limitation. As discussed below, they argue for its dismissal on other grounds.

Tennessee. *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843, 2015 WL 480239 (6th Cir. 2015). Although the limitations period for § 1983 actions is borrowed from state law, federal law governs when the limitations period begins to run. *Wallace*, 549 U.S. at 388. Accrual occurs "when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Id.* (internal quotation marks and citations omitted).

In this case, the defendants assert that the plaintiff's causes of action relating to his expulsion accrued on September 13, 2016, the date of the expulsion, and the plaintiff does not refute that proposition.[4] The filing date for the original Complaint was August 21, 2017, well within the one-year statute of limitations. The Amended Complaint was filed on January 23, 2019, well outside the limitations period. The plaintiff's claims against the new defendants are time-barred unless the Amended Complaint relates back to the filing of the original Complaint.

The plaintiff argues that his claims are not time-barred, because they are protected by the relation-back provisions in Rule 15 of the Federal Rules of Civil Procedure. Rule 15(c)(1) provides that an amendment "relates back" to the date of the original filing, for statute of limitation purposes, when:

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

---

[4] The question of whether the claims accrued the day of the expulsion, the day the plaintiff was notified that his benefits would terminate, or the day they actually terminated, is not relevant to the question of whether the claims against the new defendants are time-barred, as all of these events occurred more than one year prior to the filing of the Amended Complaint.

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(A)–(C).

The defendants argue that Rule 15(c)(1)(A) does not apply, because Tenn. Code Ann. § 28-3-104(a)(3) contains no relation-back provision. They argue that Rule (c)(1)(B) pertains only to the relation back of "an amendment asserting a 'claim or defense,' but it does not authorize the relation back of an amendment adding a new *party*." (Doc. No. 36, at 5 (citations omitted).) Finally, they contend that subsection (C) does not apply, first, because the requirements of Rule 15(c)(1)(B) are not met and, second, because the plaintiff has not shown that the new defendants received notice of the institution of this action within 90 days of the filing of the original Complaint or that the plaintiff's failure to name these defendants is the result of some "mistake" concerning the proper party's identity.

Durham, in response, maintains that the claims in the Amended Complaint against the new defendants "are based on and relate back to the very same set of operative facts originally plead[ed]." (Doc. No. 40, at 2.) He characterizes the defendants' position as "a technical argument" and a "formality that misses the substance and spirit" of Rule 15(c)(1). (Doc. No. 40, at 3.) The operative inquiry, he insists, is whether the additional defendants were on notice when the original Complaint was filed because of their involvement in carrying out the improper expulsion." (*Id.* at 3.) Alternatively, he argues that, because he sues state officials in their official capacity only, under *Ex parte Young*, "the real party-in-interest . . . [has] remained constant." (Doc. No. 40, at 4.) That is, regardless of who the named officials are, the State is and always has been the real party-in-interest in this case.

The defendants are correct that Rule 15(c)(1)(A) is of no help to the plaintiff, since § 1983 has no relation-back provision. *Accord Reiner v. Canale*, 301 F. Supp. 3d 727, 734 (E.D. Mich. 2018); *see also* 42 U.S.C. § 1983. Rule 15(c)(1)(B) is likewise inapplicable, because it "allows relation back of an amendment asserting a 'claim or defense,' but it does not authorize the relation back of an amendment adding a new *party*." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010); *see also* 6A Charles Alan Wright *et al.*, Fed. Prac. & Proc. Civ. § 1497 (3d ed.) (recognizing that Rule 15(c)(1)(B) only pertains to amendments "alleging a new or different claim or defense").

Regarding Rule 15(c)(1)(C), the first requirement is that 15(c)(1)(B) be "satisfied," meaning that "the amended claim arose out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." 6A Wright *et al.*, Fed. Prac. & Proc. Civ. § 1498 (3d ed.). The next requirement is timely notice, under 15(c)(1)(C)(i). Even assuming these prerequisites are met, however, "Sixth Circuit precedent clearly holds that *new parties* may not be added after the statute of limitations has run, and that such amendments do not satisfy the 'mistaken identity' requirement of Rule 15(c)(3)(B)." *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996). Adding a new party is not the same as "chang[ing] the party or the name of the party" against whom a claim is asserted. *See Asher*, 596 F.3d at 318 (noting that the type of changes permitted under Rule 15(c)(1)(C) are "limited to corrections of misnomers or misdescriptions" (citations omitted)).

Here, the plaintiff impermissibly seeks to add new parties. To avoid that conclusion, he insists that, in reality, he is not adding new parties, because the real party in interest in this official-capacity suit is, and always has been, the State of Tennessee. The plaintiff, however, did not sue the State of Tennessee itself until he filed the Amended Complaint, and the State has now

been dismissed by stipulation. Instead, he has sued individuals who are deemed to represent specific state agencies tasked with administering a limited array of state functions. In the Sixth Circuit, in order to avail himself of *Ex parte Young*, a plaintiff must identify and sue the state officer or officers *appropriate to his particular claim*. "General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996) (quoting *1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 113 (3d Cir. 1993)); *see id.* at 1415 ("*Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute.").

In other words, the fact that a suit against a state official in his official capacity is, in reality, a suit against the state does not mean that a plaintiff can just name any state official as a defendant and proceed with official-capacity claims against her, regardless of whether she had any authority over the actions or laws the plaintiff challenges. It would make no sense, for example, to permit the plaintiff to sue the Tennessee Commissioner of Education based on unconstitutional policies adopted by the Tennessee Highway Patrol. State officials sued in their official capacity are not interchangeable, absent some allegation of mistake that would fall within the purview of Rule 15(c)(1)(C)(ii). The plaintiff alleges no such mistake here. The court therefore finds that the newly named defendants, even though they are named in their official capacity, do not have the requisite identity with the previously named state official defendants to permit relation back for statute of limitation purposes. *Accord Messina v. Mazzeo*, 854 F. Supp. 116, 147 (E.D.N.Y. 1994) (holding that the purpose of the "legal construct" pursuant to which an official capacity-suit against a government official is treated as a suit against the entity the official represents "is not to avoid a statute of limitations on one cause of action against a

government entity by asserting a claim against a person in his official capacity on an entirely different cause of action" but, rather, "to allow the real party in interest to assert the immunities and defenses to which they are entitled").

In sum, the court finds that the claims asserted against the newly named defendants are barred by the statute of limitations and are not saved by the relation-back provisions in Rule 15(c)(1)(A), (B), or (C). The court will dismiss the claims against the newly named former officials as redundant of the claims against the newly named current officials and will dismiss the claims against the latter as barred by the statute of limitations.[5]

### B.    Count I – Was the House Resolution a Bill of Attainder?

In one of its "few explicit limitations on both federal and state action," the United States Constitution prohibits Congress and the States from passing any "Bill of Attainder." Note, *The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause*, 72 Yale L.J. 330, 332 (1962); U.S. Const, art. I, §§ 9, 10. A bill of attainder is a "law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Zilich v. Longo*, 34 F.3d 359, 362 (6th Cir. 1994) (quoting *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 846–47 (1984)). There are three essential elements to a bill of attainder: "specificity . . . , punishment, and lack of a judicial trial." *Id.* (quoting *Selective Serv.*, 468 U.S. at 847).

In *Zilich*, the plaintiff argued that a resolution and ordinance passed by a city council

---

[5] The plaintiff appears to have named the new defendants because one of the duties with which their offices are tasked is maintenance of the membership roll for the House of Representatives, and one of the forms of relief the plaintiff seeks is the reinstatement of his name on the membership roll. It is not clear, however, whether reinstatement on the roll is necessary to the provision of the relief the plaintiff is actually concerned about, which is the reinstatement of his state benefits. The court understands the plaintiff's request for reinstatement on the membership roll as simply a potential alternative route to that destination. Thus, it is unclear what effect, if any, the dismissal of the claims against these defendants will have on this case.

constituted a bill of attainder adopted in violation of Article 1 § 10 of the Constitution. The district court agreed, but the Sixth Circuit reversed, on several grounds. In particular, the court noted that the charter of the town of Garfield Heights specifically provided that the city council itself "shall be the judge of the election and qualifications of its members." *Zilich*, 34 F.3d at 362. This provision "reflect[ed] the well-settled principle that a legislature traditionally has the power to judge the so-called 'standing' qualifications . . . of its membership." *Id.* (citations omitted). The court continued:

> Plaintiff has not cited, and our research has not disclosed, a single case in which a court has held that judging a member's qualifications constitutes a bill of attainder. The Bill of Attainder Clause is a safeguard against legislative exercise of the judicial function, or more simply—trial by legislature. The "section proscribing bills of attainder . . . establishes that there are certain types of decision that are . . . inappropriate for *legislative* resolution. . . . [T]he bill of attainder clause should be viewed . . . as necessary to the effective separation of powers." *The legislative act of judging one's own members cannot be deemed a matter inappropriate for legislative resolution when the city charter specifically grants the council this power. Where the role is traditionally a legislative function, not a judicial function, the Bill of Attainder Clause does not outlaw legislative action against a specific legislator.* Legislative bodies may censure, suspend or otherwise discipline a member. They have done so under English and American law for centuries. The absence of a trial here is not problematic or even surprising because judging a member's qualifications is a legislative function, not a judicial one.

*Id.* at 362–63 (quoting Note, *supra*, at 343; other citations and internal quotation marks omitted) (emphasis added). That is, the Sixth Circuit has expressly recognized that, where a legislative body is granted the power to discipline its own members, an action taken based on that authorization is legislative in nature, rather than the exercise of a forbidden judicial function. As such, it does not qualify as a bill of attainder. To this court's knowledge, every court to consider this issue has concluded that legislative bodies have the power to discipline their own members. *See, e.g.*, *Berry v. Crawford*, 990 N.E.2d 410, 413 (Ind. 2013) (holding that the judicial branch had no authority to review the decision of the Indiana House of Representatives to collect fines

from House members in punishment for their leaving the state to prevent the formation of a quorum, where the Indiana Constitution expressly assigned to the legislature the authority to establish internal rules to govern its internal operations and to impose discipline against any member); *Gerald v. La. State Senate*, 408 So. 2d 426, 429 (La. Ct. App. 1981) ("The overwhelming weight of opinion as expressed by not only the courts of this State, but the opinion of the courts of our sister states is that the discipline and removal of a legislator is within the sole province of the body in which he serves as a member." (collecting cases)); *French v. Senate of State of Cal.*, 80 P. 1031, 1034 (Cal. 1905) ("The proposition that a resolution or other action of the Senate resulting in the expulsion of a member is in substance a bill of attainder, and therefore a violation of section 16, art. 1, of the state Constitution, and of section 10, art. 1, of the Constitution of the United States, is scarcely worthy of notice. The charges upon which a member is expelled may or may not constitute a charge of crime, but the resolution expelling him has not the force of law, and it cannot by any stretch of construction be denominated a bill of attainder.").

The plaintiff's arguments to the contrary are not persuasive. He insists that a legislative action need not have the force of "law" or be a "judicial act" to be deemed a bill of attainder, in light of Supreme Court precedent defining a bill of attainder as any "legislative act" that inflicts punishment without trial. (Doc. No. 40, at 5 (quoting *Cummings v. Missouri*, 71 U.S. 277, 323 (1867)).) *See also United States v. Lovett*, 329 303, 315 (1946) ("[Our cases] stand for the proposition that legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution.")). This court, however, is bound by the Sixth Circuit's interpretation of the Supreme Court's rulings. *See, e.g.*,

*United States v. Matos*, No. 3:13-cr-98, 2014 WL 1922866, at *3 (W.D. Ky. May 14, 2014) (explaining that a "district court is bound to follow the holding of a prior decision of the Court of Appeals for the circuit in which the district court is located until that binding precedent is expressly overruled." (citation omitted)); *accord D'Ambrosio v. Bagley*, 688 F. Supp. 2d 709, 721 (N.D. Ohio 2010) ("This is a district court, and it must follow binding precedent when such precedent exists."). And, as *Zilich* indicates, the Sixth Circuit has not construed the Supreme Court cases upon which the plaintiff relies as applying to a legislature's punishment of its own member. Rather, the Bill of Attainders Clause "should be viewed . . . as necessary to the effective separation of powers." *Zilich*, 34 F.3d at 362–63. Thus, where the action complained of is "traditionally a legislative function," and interference with such an action by the judiciary would itself constitute a separation-of-powers intrusion, such action is not prohibited by the Bill of Attainder Clause. *Id.* at 363 ("[T]he Bill of Attainder Clause does not outlaw legislative action against a specific legislator.").

The plaintiff argues that the action in question was not truly "legislative" and, further, that the House did not actually have the power to remove him, because it violated another provision of the Tennessee Constitution by voting on his removal at a time when it was not authorized to do so. The Tennessee Constitution, however, specifically assigns to the state legislature the power to "determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member." Tenn. Const. art. II, § 12. Because the Tennessee Constitution confers that power on the legislature, it is a legislative power. The fact that the vote on the motion introduced by Representative Lynn was arguably procedurally improper does not detract from the essential fact that the legislature is granted the power to discipline and expel its own members. *Accord Rangel v. Boehner*, 785 F.3d

19 (D.C. Cir. 2015) (rejecting the plaintiff's request that the court "review a congressional disciplinary proceeding—a 'legislative' matter that 'the Constitution places within the jurisdiction of [the] House'"—and noting that "[a]n act does not lose its legislative character simply because a plaintiff alleges that it violated the House Rules or even the Constitution" (citations omitted)).[6]

Durham's attempt to distinguish the facts here from those in *Zilich* is likewise unavailing. The Sixth Circuit, indeed, made it clear that one of the grounds for its dismissal of Zilich's claim was that the city council's action in that case was not actually punitive, since it merely directed the institution of judicial proceedings against him. *Zilich*, 34 F.3d at 362. But that ground for the holding was separate from the court's determination that the City Council's action in removing its own member did not qualify as a bill of attainder where the City Charter expressly granted it that authority. *Id.* at 362–63.

In sum, in accordance with *Zilich*, the court finds that the resolution to expel Durham from the Tennessee House of Representatives was not a bill of attainder. The motion to dismiss Count I of the Amended Complaint under Rule 12(b)(6) will be granted on that basis.

### C.      Count II – Eleventh Amendment Immunity

The defendants in this action are all state officials sued only in their official capacity as representatives of the State of Tennessee. They argue that the Eleventh Amendment bars the due process claims against them. In the Sixth Circuit, sovereign immunity is a jurisdictional matter that "must be addressed prior to reaching the merits." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045–46 (6th Cir. 2015).

The Eleventh Amendment "deprives federal courts of subject-matter jurisdiction when a

---

[6] *Rangel* concerned the application of absolute immunity under the Speech or Debate Clause, Article 1, Section 6, Clause 1 of the United States Constitution.

citizen sues his own State unless the State waives its immunity or Congress abrogates that sovereign immunity." *Id.* at 1046 (citation omitted). The State has not waived its immunity to this suit or generally to suits under § 1983, *Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986), nor has Congress abrogated the State's immunity. *Quern v. Jordan*, 440 U.S. 332, 345 (1979). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As such, it is in actuality a suit against the State itself and, therefore, generally barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

However, the doctrine announced in *Ex parte Young*, 209 U.S. 123 (1908), provides another exception to sovereign immunity asserted by states. In order to fall within the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law. *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013); *see, e.g.*, *Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir. 2002) ("[C]laims for reinstatement are prospective in nature and appropriate subjects for *Ex parte Young* actions.").

In *Carten*, a student dismissed from a state university for poor academic performance brought suit against various individual university representatives in their official capacity under Title II of the ADA, asserting, among other claims, that the defendants had refused to accommodate his learning disability and had expelled him based on that disability. In addition to other relief, he sought reinstatement. The defendants argued that the request for reinstatement was not truly prospective in nature, because the plaintiff did not allege a continuing violation of law and sought a "retrospective reversal of a completed state decision to expel him." *Carten*, 282 F.3d at 396. The Sixth Circuit rejected that argument, holding that reinstatement constituted

prospective relief designed to end a continuing violation of federal law. *Id.*

On the other hand, "*all* retroactive relief," and not merely "retroactive monetary relief," is barred by the Eleventh Amendment. *S&M Brands, Inc. v. Cooper*, 527 F.3d 500, 509 (6th Cir. 2008) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103 (1984)). In *S&M Brands*, although the plaintiffs claimed that they sought an order requiring the state attorney general, "upon request by the manufacturers sometime in the future," to release certain escrow funds associated with past cigarette sales, *S&M Brands*, 527 F.3d at 509, the Sixth Circuit found that the relief sought was actually retrospective, based on a prior decision made by the attorney general, and therefore barred by the Eleventh Amendment: "The alleged constitutional deficiency here is a one-time, past event; the Plaintiffs do not seek a prospective injunction that requires the Attorney General to conform his conduct in an ongoing, continuous fashion." *Id.* at 510.

The defendants in this case argue that the plaintiff's claims in this case do not fall within the *Ex parte Young* exception, because (1) he seeks a declaration that the state officers violated federal law in the past; (2) he does not allege an ongoing violation; (3) *Ex parte Young* does not extend to prospective declaratory or injunctive relief based on alleged violations of state law; and (4) the relief he seeks is essentially monetary insofar as it seeks the payment of retirement and health insurance benefits, as the effect of any relief granted would be to force the defendants to withdraw funds from the State Treasury. (Doc. No. 36, at 11–13.)

In response, the plaintiff argues only that he has sued the appropriate state officials as permitted by *Ex parte Young*. (Doc. No. 40, at 9–10.) In support of this contention, the plaintiff cites his own case, *Durham v. Martin*, 905 F.3d 432, 433 (6th Cir. 2018), which held that the plaintiff had standing to sue the particular defendants named in the original Complaint. The Sixth

Circuit, however, expressly did not reach the question of whether the suit should survive on the merits. *Id.* at 436. Regrettably, Durham has not addressed the questions of whether the relief he seeks is retrospective or prospective in nature or what effect it would have on the State Treasury. Instead, he simply argues that he states a claim against the named defendants. (*See* Doc. No. 40, at 9 ("All of these defendants played a role in implementing the actions that led to the deprivation of Plaintiff's constitutional rights . . . .").)

The court nonetheless construes the Amended Complaint as seeking prospective relief. The plaintiff specifically seeks the "[i]ssu[ance of] an injunction requiring Defendants to reinstate . . . Plaintiff's state pension and health insurance coverage." (*Id.* at 14.)[7] As set forth above, the Sixth Circuit has held that reinstatement generally is prospective relief of the type that falls within the scope of *Ex parte Young*. *Carten*, 282 F.3d at 396. The request that the plaintiff's right to a state pension and state-provided healthcare be reinstated and that he maintain those benefits going forward seeks prospective relief, regardless of the fact that the relief, if afforded, might cost the State money. *See S&M Brands*, 527 F.3d at 507 ("Under the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law, regardless of whether compliance might have an ancillary effect on the state treasury." (citations omitted)).

The court therefore finds that the § 1983 claim set forth in Count II of the Amended Complaint, insofar as the plaintiff requests prospective injunctive and declaratory relief only, is not barred by the Eleventh Amendment.

---

[7] As stated above, the plaintiff also demands an injunction requiring "Defendants to reinstate Plaintiff to the House membership roll for the remainder of the 109th General Assembly." (Doc. No. 33, at 14.) The claims against the individuals responsible for maintenance of the roll are barred by the statute of limitations, and it does not appear that the originally named defendants in their official capacity have the authority to perform this task.

### D. Count II – Whether the Amended Complaint States a Colorable Claim under 42 U.S.C. § 1983 for the Deprivation of Due Process

Next, the defendants argue that the plaintiff fails to state a claim for which relief can be granted under 42 U.S.C. § 1983 for violation of his right to due process.

Under the Fourteenth Amendment, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The due process clause has both procedural and substantive components, *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012), but the court construes the Amended Complaint as intending to state a claim for violation of the right to procedural due process.

"To establish a procedural due process claim, a plaintiff must show that (1) [he] had a life, liberty, or property interest protected by the Due Process Clause; (2) [he] was deprived of this protected interest; and (3) the state did not afford [him] adequate procedural rights." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014). A plaintiff can prevail if he demonstrates either that he was deprived of a liberty or property interest as a result of an "established state procedure" that itself violates procedural due process rights or that he was deprived of a liberty or property interest "pursuant to a random and unauthorized act," and available state remedies would not adequately compensate him for the loss. *Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 349–50 (6th Cir. 2010).

The defendants here argue that the plaintiff fails to state a due process claim, because (1) the plaintiff cannot establish as a legal matter that he had a protected property interest in "lifetime state benefits" and that, even if he could, (2) he has not shown that the available state procedures for redressing the deprivation of those benefits are inadequate. (Doc. No. 36, at 14.) The plaintiff contends that he had a protected property interest in the state benefits and that there is no available state procedure to redress expulsion from the legislature.

### 1.     Legal Standards

#### a.     Protected Property Interest

Property interests protected by the Fourteenth Amendment "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause'. . . ."). However, "[a]lthough the underlying substantive interest is created by an independent source such as state law, federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005) (internal quotation marks omitted). The Supreme Court has explained that, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "A statute creates a protected property interest when it 'both confers [a] benefit and limits the discretion of the [government] to rescind the benefit.'" *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 709 F.3d 584, 594 (6th Cir. 2013) (quoting *Med Corp., Inc. v. City of Lima*, 296 F.3d 404, 410 (6th Cir. 2002)); *see Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("[T]he interest of an individual in continued receipt of [Social Security disability benefits] is a statutorily created 'property' interest protected by the Fifth Amendment."); *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 856–57 (6th Cir. 2012) (no property interest if the government has the discretion to

rescind the benefit entirely).

### b. The Adequacy of State Procedures for Redress

Determining that the plaintiff has vested property interests is just the first step of the required analysis. "[I]n order to state a procedural due process claim under section 1983 'the plaintiff must attack the state's corrective procedure as well as the substantive wrong.'" *Nunn v. Lynch*, 113 F. App'x 55, 61 (6th Cir. 2004) (quoting *Meyers v. City of Cincinnati*, 934 F.2d 726, 731 (6th Cir. 1991)). "If satisfactory state procedures are provided in a procedural due process case, then no constitutional deprivation has occurred despite the injury." *Jefferson v. Jefferson Cty. Pub. Sch. Sys.*, 360 F.3d 583, 587–88 (6th Cir. 2004) (citations omitted). That is, the absence of a state procedural remedy is an element of a plaintiff's procedural due process claim that must be pleaded and proved by the plaintiff. *See id.* at 588 ("The plaintiff must prove the inadequacy of state remedies as an element of her constitutional tort." (citations omitted); *Farhat v. Jopke*, 370 F.3d 580, 597 (6th Cir. 2004) ("[Appellant] has failed to allege and prove the inadequacy of state remedies, which failure is fatal to his procedural due process claim."); *Allen v. Louisville City Police Dep't*, 972 F.2d 346 (6th Cir. 1992) ("Where a plaintiff alleges the deprivation of a property or liberty interest without procedural due process of law, then the plaintiff must plead that no adequate state remedies exist before we will consider the claim.").

In short, to meet this burden, the plaintiff must allege and prove that (1) the state did not have a remedy; (2) the state had a remedy but it was inadequate; or (3) the state had an "adequate remedy in form, both procedurally and in damages, but the state did not apply it or misapplied its remedy." *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999) (citation omitted).

### 2. The Alleged Deprivation of Vested State-Created Interests

The plaintiff alleges that he has a protected property interest in benefits accorded certain

state employees, specifically a lifetime health insurance benefit and retirement pension benefit. Regarding these benefits, the Amended Complaint contains only the most cursory and conclusory assertions, consisting, in their entirety, of the following:

> Plaintiff Jeremy Durham brings this action to challenge the State of Tennessee's unconstitutional action inflicting punishment on him without a judicial trial and depriving him of his protected property interests in his state benefits via an illicit and unjustified expulsion from the Tennessee House of Representatives (the "House") on September 13, 2016.

(Doc. No. 33 ¶ 1.)

> [The House expulsion vote violated] Article III, Section 9 of the Tennessee Constitution . . . , and it resulted in the deprivation of Plaintiff's protected property interest in his state benefits, specifically his pension and insurance benefits.

(Doc. No. 33 ¶ 4.)

> After the expulsion vote, Plaintiff made an inquiry regarding the premiums on his insurance coverage. On September 26, 2016, Plaintiff received a response from Angie Gargaro from the State's Benefits Administration Division. Ms. Gargaro informed Plaintiff that his health insurance coverage would terminate on September 30, 2016. She stated that Defendant Commissioner Martin, after consultation with Defendant Attorney General Slattery, decided that Plaintiff was not entitled to lifetime coverage benefits.

> As the direct and proximate result of his improper and unauthorized expulsion, Plaintiff has lost his lifetime health insurance benefits and pension and has been so informed by the State's Benefits Administration Division.

(Doc. No. 33 ¶¶ 18, 19; *see also* ¶¶ 60, 61.)

> The House's expulsion of Plaintiff was a legislative action that punished Plaintiff by expelling him from office and taking away his vested health insurance and pension benefits without a judicial trial.

(Doc. No. 33 ¶ 67.)

> Plaintiff Durham had a protected property interest in his state benefits and was denied due process through the deprivation of these benefits.

(*Id.* ¶ 74.)

> Based on the plain language of Article III, Section 9 and the prior failed attempts to call a special session for the specific purpose of expelling Durham, Plaintiff had the reasonable understanding that he would retain his state benefits (lifetime health insurance and a state pension) at the end of his term.

(*Id.* ¶ 75.)

The defendants argue that the plaintiff's reasonable understanding that he would retain his state benefits at the end of his term is not sufficient to create an entitlement to those benefits and that the state statutes creating and defining the right to retirement and health insurance benefits make clear that the plaintiff does not have a legitimate claim of entitlement to either benefit. (Doc. No. 36, at 15.) They also argue that the plaintiff has not shown that the State's remedies for redressing the deprivation of these benefits was inadequate.

The court addresses the question of whether the Amended Complaint states a claim related to the deprivation of the state health insurance benefit and the retirement benefit separately, as the analysis pertaining to each differs substantially.

### a. Health Insurance Benefit

*Did Plaintiff Have a Protected Property Interest?*

Regarding the plaintiff's claim that he was deprived of his entitlement to state-provided health insurance, the defendants argue, first, that the plaintiff does not have a protected property interest in a lifetime health insurance benefit, because the statute providing such a benefit does not apply to his situation. That statute says, in relevant part:

> Upon *retirement* from the general assembly, any senator or representative . . . may elect to retain retiree health benefits by participating in the plan authorized by the state insurance committee . . . .

Tenn. Code Ann. § 8-27-208(a)(1) (2015) (emphasis added).

The defendants maintain that the plaintiff did not "retire" from the General Assembly and, therefore, is not eligible for health insurance benefits under this provision, based on the

ordinary and common definition of the term "retire." He was, instead, expelled. (Doc. No. 36, at 19–20.) Consequently, they argue, Durham does not have a legitimate expectation of insurance coverage under § 8-27-208 and no constitutionally protected property interest in such benefits.

The plaintiff responds that (1) defendant Ridley, who is responsible for all administrative matters and member benefits for the General Assembly, publicly stated that the plaintiff would keep his health benefits, even if he were expelled from the house, thus giving rise to a "reasonable expectation" that he remained eligible for such benefits; (2) the defendants' proposed interpretation of "retire" would lead to an absurd result, since it would mean that representatives who lost re-election campaigns should not be eligible for coverage either, but "there is no question that such individuals are still entitled to health insurance benefits" under § 8-27-208 (Doc. No. 40, at 12); and (3) if he had not been "unconstitutionally expelled," he would have effectively retired from the legislature, having decided not to run for re-election (*id.*).

The plaintiff's first argument is unavailing. A statement by defendant Ridley cannot create a binding property interest if it is in fact contradicted by state law, as indicated above. *See Logan*, 455 U.S. at 430 ("The hallmark of property . . . is an individual entitlement grounded in state law."); *see also Puckett v. Lexington-Fayette Urban Cty. Gov't*, 566 F. App'x 462, 468 (6th Cir. 2014) ("[R]epresentations and customs may not create a property right where they are contrary to an existing statute or regulation.").

With his second argument, the plaintiff suggests that "retirement" has been extended to apply to state legislators who lose re-election bids, meaning that they are entitled to keep their health insurance, even though they do not "retire" from the legislature in the sense of leaving it voluntarily. The plaintiff appears to argue that, because legislators in that situation are permitted to keep their health insurance, the statute should extend to cover his situation as well. In other

words, he is suggesting that, even though he was expelled, he had a reasonable expectation that he would keep his benefits, because expulsion is a form of retirement.[8] The court notes that there is actually no proof in the record regarding whether legislators who lose re-election bids are permitted to keep their health insurance benefit. Even assuming that they are, however, there is no obvious absurdity in treating a state representative who has been expelled from the General Assembly differently from one who merely loses re-election. And as a matter of simple statutory construction, the court finds that the term "retirement" does not encompass an involuntary expulsion from the legislature. As the defendants argue, "retirement" is ordinarily defined as "withdrawal from one's position or occupation or from active working life,"[9] and it implies a voluntary action on the part of the person withdrawing. Conversely, "expel" is defined as "to force to leave (a place, an organization, etc.) by official action[;] take away rights or privileges of membership."[10] The terms are not remotely synonymous. *Accord Brown v. Little, Brown & Co.*, 168 N.E. 521, 526 (Mass. 1929) ("When . . . used [in the intransitive sense, retirement] means voluntary withdrawal and not compulsory discharge. This is the c[o]nsensus of opinion among lexicographers as to its signification. Often it carries the implication of recognition of honorable service. It is the antithesis of enforced resignation. It is not synonymous with 'expel,' 'remove,' 'dismiss,' or words of similar import."); *see also Jacobs v. N.J. Highway Auth.*, 255 A.2d 266, 268 (N.J. 1969) ("Retirement from employment has a connotation different from discharge. The former ordinarily signifies voluntary withdrawal, the latter compulsory dismissal."). It is clear that, as a result of his expulsion, the plaintiff did not simply retire from the General Assembly, and this comparison does not further his claim regarding the existence of a protected property

---

[8] This argument is actually contrary to the plaintiff's own interests. *See* Note 11, *infra*.

[9] *See* https://www.merriam-webster.com/dictionary/retirement.

[10] *See* https://www.merriam-webster.com/dictionary/expel.

interest.

Nonetheless, regarding the third argument, which is contrary to his second, Durham's position all along has been that his unconstitutional expulsion actually prevented his retirement from the legislature and that the defendants' determination that he was not entitled to health insurance benefits resulted directly from his ouster. (*See, e.g.*, Doc. No. 33 ¶ 19 ("As the direct and proximate result of his improper and unauthorized expulsion, Plaintiff has lost his lifetime health insurance benefits . . . and has been so informed by the State's Benefits Administration Division.").) More specifically, he alleges that he was expelled without due process and for the express purpose of preventing his "retirement" from the legislature in order to effect the deprivation of his continued right to health insurance coverage. And the defendants actually do not dispute that, if Durham had not been forcibly expelled from the legislature, his right to health insurance would have continued unabated following the expiration of his second term in the legislature. (*See* Doc. No. 36, at 1 ("As a result of this expulsion, Plaintiff is not entitled to lifetime health insurance . . . benefits under state law.").) In that sense, it was potentially a property right created and protected by state statute that was not subject to arbitrary or unilateral termination.

In addition, the plaintiff adequately alleges that his ouster from the state legislature was in violation of his federal due process rights, given, in particular, that he was not provided advance notice of the resolution to expel him and that the bringing of the motion violated the procedure established by the state constitution, providing that special sessions are to deal only with the purposes for which they are called. *Accord Gerald v. La. State Senate*, 408 So. 2d 426, 429 (La. Ct. App. 1981) (recognizing that the discipline and removal of a legislator was "within the sole province of the body in which he serves as a member" and not subject to judicial review,

unless "the legislative body clearly violates some express constitutional requirement, such as the requirement of due process mandated by Article XIV of the United States Constitution"); *see also McCarley v. Sanders*, 309 F. Supp. 8, 11–12 (M.D. Ala. 1970) (vacating a state senator's expulsion from the Alabama State Senate based on the violation of his right to due process (but without addressing the Eleventh Amendment), based on the lack of "adequate notice," no formal charges, and no hearing).

Thus, the court finds, for purposes of the Motion to Dismiss, that the plaintiff has sufficiently alleged that he had a vested property interest in the state health insurance benefit. *Accord Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 343 (E.D.N.Y. 2009) ("[I]n light of statutory protections afforded to retirees of the State, the Court finds that Jackson has a constitutionally protected property interest in health insurance benefits.").

### *Were the State's Remedies Inadequate?*

But this answers only half the question. The second part of the inquiry is whether the plaintiff adequately alleges that the State's procedure for redressing the deprivation of his protected property interest was inadequate. Regarding this question, the plaintiff alleges generally that he was not provided with appropriate or meaningful notice or an opportunity to be heard prior to the expulsion vote and that the State did not provide any post-expulsion process. (Doc. No. 33 ¶¶ 3, 79.) He claims that, "as a direct and proximate result of his improper and unauthorized expulsion, [he] lost his lifetime health insurance benefits." (*Id.* ¶ 19).

The defendants argue that Tenn. Code Ann. § 8-27-102 authorizes an informal appeal process for resolving disputes over health insurance plan eligibility and that the Uniform Administrative Procedures Act ("APA") authorizes an "affected person" to petition an agency for a declaratory order as to the validity or applicability of a statute, rule or order within the

primary jurisdiction of the agency, such agency decision being subject to judicial review, Tenn.
Code Ann. §§ 4-5-322 through -325.

The plaintiff does not address these statutes but maintains that the defendants' assertion
that post-deprivation remedies existed in his situation is misleading. Specifically, he claims that
there is no procedure for undoing his expulsion or reconvening another special session in order
to be reinstated. He also claims that there is no state or administrative procedure that would
"compensate Plaintiff for the deprivation of his benefits." (Doc. No. 40, at 12–13.) Of course,
this court cannot order the state to compensate Durham for the deprivation of his benefits either.
That is precisely the type of retroactive monetary relief barred by the Eleventh Amendment. But
the plaintiff's broader point is well taken. Section 8-27-102, cited by the defendants, provides
only for the administrative resolution of "disputes regarding eligibility and enrollment for the
plans and the benefit structure of the plans administered by those committees." And the APA
itself, while providing for judicial review of an administrative decision, limits such review to the
"record" and confines relief to situations where the agency decision itself has prejudiced a
claimant's rights

> because the *administrative* findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly
> unwarranted exercise of discretion; or
>
> (5)(A) Unsupported by evidence which is both substantial and material in the light
> of the entire record.

*Publix Super Markets, Inc. v. Tenn. Dep't of Labor & Workforce Dev.*, 402 S.W.3d 218, 222

(Tenn. Ct. App. 2012) (quoting Tenn. Code Ann. § 4-5-322(h)(1)–(5)(A)). In other words, where the administrative decision itself is reasonable, based on existing law, these statutes would not provide relief. Here, the administrative decision to deny Durham health benefits because he did not "retire" from the General Assembly, in all likelihood, would have been found to be a reasonable interpretation of the applicable statutes.

Durham's position is that it was the ouster itself, and not the defendants' incorrect or unreasonable interpretation of Tenn. Code Ann. § 8-27-208(a)(1), that led directly to the deprivation of his protected property interest in his health benefits.[11] In other words, precisely because he did not "retire" from the legislature, and because the vote to expel him was made for the express purpose of depriving him of the health insurance benefit, pursuing the administrative procedures established by the APA would have been futile in his case. The Amended Complaint adequately alleges that the state procedures would not have provided an avenue for reversing the expulsion or reinstating the plaintiff to the General Assembly in order to render the plaintiff eligible under the statute for continued health insurance coverage, and thus would not have been adequate to protect his rights.

Based on this argument, the court finds that the Amended Complaint states a colorable claim under § 1983, based on the deprivation of due process, which allegedly led to the

---

[11] As indicated above, Durham's Response to the Motion to Dismiss actually suggests that defendant Ridley, at least, believed that expulsion should not result in the termination of the plaintiff's health insurance benefit and that "retirement" as used in Tenn. Code Ann. § 8-27-208(a)(1) should extend to an expelled legislator, since the State has construed it to mean that legislators who lose re-election bids can maintain their coverage. If that were the case, however, then there would be no apparent reason why the plaintiff could not have brought an administrative challenge to the denial of the benefit in his case, following the APA-prescribed procedures. The court has found, however, that the statutory use of the term "retirement" cannot reasonably be construed to encompass an expulsion. Consequently, it seems clear, at this juncture at least, that the administrative decision itself—the denial of continued coverage because the plaintiff had not "retired"—was reasonable based on existing law. As a result, the APA would not have provided relief.

plaintiff's being denied lifetime health insurance benefits in which he has sufficiently established a vested property interest, for purposes of defeating a motion to dismiss.

### b.        Retirement Benefit

The plaintiff's factual allegations in the Amended Complaint regarding the alleged deprivation of his right to a state retirement benefit are more amorphous than those pertaining to the health insurance benefit. The plaintiff does not specifically allege that he made a claim for these benefits. Instead, as indicated above, he asserts only that his expulsion from the legislature *per se* "resulted in the deprivation of Plaintiff's protected property interest in his . . . pension [benefit]." (Doc. No. 33 ¶ 4; *see also id.* ¶¶ 19, 67.) Regarding this claim, the defendants argue, first, that the plaintiff fails even to allege that he elected to participate in the Tennessee Consolidated Retirement System ("TCRS"), that he applied for retirements benefits pursuant to Tenn. Code Ann. § 8-36-202, or that his application was denied by any defendant or anyone else. Second, they contend that, under the statutes creating and governing the TCRS, the plaintiff, a "general employee" as defined by Tenn. Code Ann. § 8-34-101(18) and thus a member of "Group 1," Tenn. Code Ann. § 8-35-105(a)(1), never became eligible for retirement benefits because he did not achieve the five years of creditable service required by Tenn. Code Ann. § 8-36-201(a)(1). In other words, the defendants' position is that the plaintiff did not have a vested property interest in retirement benefits and would not have had such a property interest, even if he had continued to serve in the General Assembly until his term expired at the end of 2016, because he still would not have had five years of creditable service as a state employee at that point.[12] They also argue that he has failed to allege that the state lacked an adequate remedy to address the deprivation of any purported property interest.

---

[12] A stated above, the plaintiff was first elected to the Tennessee General Assembly in November 2012.

The court accepts, for purposes of the Motion to Dismiss, that the plaintiff has adequately alleged that he elected to participate in the state retirement system. Otherwise, however, the plaintiff's factual allegations in support of this claim are utterly insufficient. He does not allege that he ever made a claim for retirement benefits, that some particular statute operated to terminate his retirement benefit as a result of his expulsion, or that the state lacked a procedure for remedying the allegedly wrongful deprivation of a vested interest. On this basis alone, the court finds that the Amended Complaint fails to state a colorable claim based on the alleged deprivation of due process in connection with a vested interest in a state retirement benefit.

Even if the court accepts, for purposes of the motion to dismiss, that the Amended Complaint adequately alleges that the plaintiff made a claim for benefits that was denied by the defendants, he has not responded at all to the defendants' argument that, under Tennessee law, he did not have a vested interest in a state retirement benefit and, further, that his expulsion from the legislature had no effect on his right to a state retirement benefit. Rather than addressing this issue, the plaintiff asserts only that he had a "reasonable understanding," based on "numerous representations as well as long-standing custom and practice," that "his time in the General Assembly entitled him to these benefits." (Doc. No. 40, at 10–11.) He claims that "[e]vidence such as representations and customs may be used to determine whether a party has a legitimate expectation to retirement benefits" and insists that he had "no reason to believe that he would not be entitled to his benefits." (*Id.*) Without providing a citation to any particular statute, he claims, in a wholly conclusory fashion, that he "met the statutory eligibility requirements for retirement benefits." (Doc. No. 40, at 11.) As stated above, however, custom and representations alone are not sufficient to create a protected property interest. *Puckett*, 566 F. App'x at 468. Instead, the entitlement must be grounded in state law. *Logan*, 455 U.S. at 430. And the plaintiff simply fails

to address the applicable state law.

The code provision cited by the defendants states:

> (1) Any member in Group 1 shall be one hundred percent (100%) vested in the member's service retirement benefit upon attainment of sixty (60) years of age or upon completion of thirty (30) years of creditable service; provided, that any member of Group 1 who became a member of the retirement system on or after January 1, 1992, must have five (5) years of creditable service.

Tenn. Code Ann. § 8-36-201(a)(1). On its face, this provision appears to mean that, even if his legislative term had simply expired at the end of 2016, the plaintiff's retirement benefit would not have vested 100%, because he would not have achieved five years of creditable service.[13] However, in response to the defendants' assertion that this provision pertains to the plaintiff and establishes that he did not have a vested interest in retirement benefits, the plaintiff states only: "Plaintiff met the statutory eligibility requirements for retirement benefits." (Doc. No. 40, at 11.) He does not suggest an alternative interpretation of the statute or attempt to explain why it might not pertain to him.

The defendants, likewise, do not explain how § 8-36-201(a)(1) is construed by the TCRS regulations, what it means to be less than 100% vested, or how § 8-36-201(a)(1) should be read in conjunction with other parts of the statutory scheme, in particular § 8-36-204,[14] but the court's

---

[13] The statute also provides that "[a] member shall be one hundred percent (100%) vested in the member's accumulated contributions at all times." Tenn. Code Ann. § 8-36-201(h). In addition, in the event "of a full or partial termination of, or a compete discontinuance of employer contributions to, the plan, the accrued benefits of the affected members under the plan shall be one hundred percent (100%) vested and nonforfeitable to the extent funded and to the extent required by federal law." *Id.* § 8-36-201(i). The court does not construe the Amended Complaint as alleging that the plaintiff was deprived of his own contributions or accrued employer contributions to the state retirement system.

[14] Section 8-36-204 states in pertinent part:

> (b) . . . (2) Notwithstanding this section or any other provision to the contrary, any individual who is a Group 1 member of the retirement system on or after January 1, 1992, must have, in addition to all other requirements for service or early service retirement, a total of five (5) years of creditable service to qualify for retirement benefits . . . .

limited understanding of these provisions indicates that, regardless of whether the plaintiff had a vested property interest in a retirement benefit, that interest was not affected by his expulsion from the state legislature. If the language of § 8-34-201, upon which the defendants rely, indeed requires five creditable years of service before an official's right to a retirement benefit vests, then the plaintiff's interest had not yet vested at the time of his expulsion and *would not have vested* even if he had not been expelled, because he would not have had five years of service upon the expiration of his term in the General Assembly at the end of 2016. On the other hand, if the language of § 8-34-204(c) applies instead, *see* Note 14, then state legislators may not have been subject to *any* requirement pertaining to length of service in order for their retirement benefits to vest. In that event, the plaintiff may have had a vested interest, but it was not affected by his expulsion. In other words, the plaintiff's expulsion had no apparent effect on his eligibility for retirement benefits.

As indicated above, the plaintiff does not actually allege that he made a request or even inquired about his retirement benefit. He also does not allege that the state remedy for addressing an allegedly wrongful denial of the benefits was inadequate. Instead, he alleges only that there was no post-deprivation remedy to address his expulsion from the General Assembly. However, because his expulsion from the legislature apparently had no effect on his right to a retirement benefit, that argument is beside the point. Instead, the relevant question is: what remedies were available to Durham specifically pertaining to the purportedly wrongful denial of the state retirement benefit under the statutory scheme (again assuming he made a request that was actually denied).

The plaintiff does not allege that the State does not have any pre- or post-deprivation

---

(c) This provision shall not apply to members of the general assembly.

Tenn. Code Ann. § 8-36-204(b)(2)–(c).

remedy pertaining to the denial of the retirement benefit, that it has a remedy but not an adequate one, or that an adequate remedy existed but it was misapplied in his case. *Hahn*, 190 F.3d on 716. The defendants, on the other hand, point out that state administrative rules specifically provide that

> [a]ny person who is aggrieved by an action or decision made within the discretion or control of the TCRS, may appeal the action or decision to the director. Grievances shall address the TCRS's interpretations of the law and the validity and applicability of the policies promulgated under the law as they apply to each individual's situation.

Tenn. Comp. R. & Regs. Ch. 1700-03-2-.03(1). The available procedure also encompasses judicial review under the APA. *See, e.g.*, Tenn. Code Ann. § 4-5-322 (providing for judicial review in Chancery Court).[15] The plaintiff does not allege that he attempted to avail himself of this procedure or that it was inadequate.

In light of the language of the statute pertaining to the vesting of benefits and the statutes and regulations creating a process for challenging the denial of benefits, the court does not accept as true the plaintiff's conclusory assertion that he was "afforded no post-deprivation remedy to challenge [the] . . . deprivation of his state benefits." (Doc. No. 33 ¶ 79.) Because the Amended Complaint does not allege as a factual matter that the plaintiff availed himself of the statutory remedy, that the remedy is inadequate in his case, or that the State misapplied the remedy, the court finds on this basis too that the Amended Complaint fails to state a procedural due process claim for which relief may be granted as it pertains to the purported deprivation of a state retirement benefit.

## IV.    Conclusion

For the reasons set forth herein, the defendants' Motion to Dismiss will be granted in part

---

[15] This code section was amended effective July 1, 2018, but both versions provide for judicial review of administrative decisions.

and denied in part. The claims against the newly named defendants will be dismissed as barred by the statute of limitations. Count I of the Amended Complaint will be dismissed, because the House Resolution to expel the plaintiff was not a bill of attainder. Count II of the Amended Complaint will be dismissed in part. The court finds that the plaintiff has failed to show that he was deprived of a vested state interest in a state retirement benefit or that, even if he was, there was no adequate state procedure to remedy the allegedly unconstitutional deprivation of that benefit. However, he has stated a colorable due process claim related to the termination of his state health insurance benefit. Count II of the Amended Complaint related to that deprivation will be permitted to proceed.

An order consistent with this Memorandum is filed herewith.


_____
ALETA A. TRAUGER
United States District Judge