# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **JEREMY R. DURHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:17-cv-01172** |
| | ) | **Judge Aleta A. Trauger** |
| **BUTCH ELEY, as Commissioner of** | ) | |
| **Finance and Administration, in his** | ) | |
| **official capacity,[1] et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM

Before the court is plaintiff Jeremy Durham's Motion for Summary Judgment (Doc. No. 64), seeking judgment in his favor on the sole remaining claim in this case: whether he was denied due process in connection with the termination of certain health insurance benefits, which resulted from his expulsion from the Tennessee legislature. For the reasons set forth herein, the plaintiff's motion will be denied.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The basic facts of this case are undisputed.[2] Plaintiff Jeremy Durham was elected to the 108th General Assembly of the Tennessee House of Representatives in November 2012 and served

---

[1] Durham originally sued Larry Martin in his official capacity as the Tennessee Commissioner of Finance and Administration. Martin was succeeded by Stuart McWhorter and then Butch Eley, who was appointed to that position in April 2020. Commissioner Eley is automatically substituted for former-Commissioner Martin as a defendant in this case. Fed. R. Civ. P. 25(d).

[2] Unless otherwise indicated, the facts set forth herein are drawn from the defendants' Response to [Plaintiff's] Statement of Undisputed Material Facts (Doc. No. 69) and the plaintiff's Response to Defendants' Supplemental Statement of Undisputed Material Facts (Doc. No. 72).

a full term, which expired in 2014. He was reelected in 2014 to serve a full term as a member of the 109th General Assembly. Under ordinary circumstances, his term would have expired on the date of the general election in November 2016. *See* Tenn. Const. art. II, § 3 ("Representatives shall hold office for two years . . . from the day of the general election . . . .").

On September 2, 2016, then-Governor Bill Haslam announced that he would call a special session of the General Assembly after learning that sixty million dollars in federal highway funds was in jeopardy. The governor's proclamation, calling for the special session, identified four specific items for the General Assembly to consider and act upon. All four items dealt with certain DUI laws and federal highway funds. (*See* Proclamation, Doc. No. 33-1.) The Proclamation did not mention or reference Durham.

Prior to the announcement of the special session, Durham had been the subject of an investigation and report issued by the Tennessee Attorney General's office ("Report") in July 2016.[3] (Doc. No. 72-1, Durham Decl. ¶ 4.) Durham did not receive a copy of the Report until it was released to the public. (Durham Decl. ¶ 5.) The Report cited anonymous sources and identified the individuals alleging improper conduct by Durham only as "Jane Doe." (Durham Decl. ¶ 6.) The Report concluded that Durham had engaged in "disorderly conduct" while in office.[4] Prior to issuing the Report, the Attorney General's office told Durham that he could answer questions from the office's investigators, but the Attorney General's office did not notify Durham of the nature of

---

[3] The Report is not in the court's record but is available online at https://www.documentcloud.org/documents/2993307-Final-Report-Into-Inappropriate-Conduct-Rep.html.

[4] More specifically, the Report concluded that Durham had engaged in sexually inappropriate conduct involving at least 22 women between 2012 and 2016. Report at 2.

the allegations against him or the identity of his accusers in advance of the meeting. (Durham Decl. ¶ 7.) Durham declined to meet with the investigators. (*Id.*)

Shortly after the Report became public, Representative Mike Stewart called for a special session of the Tennessee House of Representatives to vote to expel Durham, but the call failed. (Doc. No. 33 ¶¶ 35, 39; Doc. No. 63 ¶¶ 35, 39.) House Republican Caucus Chair Glen Casada and Representative Joe Armstrong circulated a second petition to call a special legislative session to oust Durham. That petition failed as well. (Doc. No. 33 ¶ 40; Doc. No. 63 ¶ 40.)

On July 14, 2016, Durham publicly announced that he would not seek reelection. (Doc. No. 33 ¶ 42; Doc. No. 63 ¶ 42.)

On July 26, 2016, *The Tennessean* newspaper quoted defendant Connie Ridley, Director of Legislative Administration, as stating: "All members of the general assembly who are elected to serve a full term of office as a member of the general assembly are eligible to continue their health insurance by paying the appropriate premium amount." (Doc. No. 33 ¶ 37; Doc. No. 63 ¶ 37.)

On September 12, 2016, during the special session called by the governor, Representative Susan Lynn made a motion to expel Jeremy Durham from the House of Representatives. Durham learned about the motion late in the afternoon of September 12, 2016, through a text alert from an online newspaper article. (Durham Decl. ¶ 10.) A few hours later, Doug Himes, then-Director of the Office of Legal Services for the Tennessee General Assembly, emailed Durham to notify him that the House would be considering a motion to expel him the next day. (Doc. No. 70-1, Himes Decl. ¶¶ 1, 2 & Ex. A; Durham Decl. ¶ 14.) Durham contacted his personal attorney as soon as he heard about the motion and discovered that his attorney would not be available to accompany him to the General Assembly the following morning. (Durham Decl. ¶ 11.) That evening, Durham

wrote a letter to his House colleagues detailing the ways in which he believed the Attorney General's investigation and the motion to expel him had denied him the right to due process. He also expressed his belief that he would not receive a fair hearing on the House floor. (Durham Decl. ¶ 18 & Ex. B, Doc. No. 72-1, at 12–19.)

On September 13, 2016, prior to his expulsion, Durham was given an opportunity to address the House. He spoke for approximately thirteen minutes before voluntarily concluding his statements. Debate on the motion remained open for an additional hour, during which time members of the House could pose questions to Durham. Durham, however, was not permitted to ask questions or to confront the accusers whose allegations formed the basis of the Attorney General's Report. At some point during this debate, Durham voluntarily left the House. The House eventually voted 70-2 to expel Durham. Durham was not present for the vote. He alleges that, due to Ridley's comments in *The Tennessean*, he believed that he would retain his health insurance benefit, even if he was expelled from the House. (Durham Decl. ¶¶ 22–23.)

On September 26, 2016, after the expulsion, Durham received correspondence from defendant Connie Ridley's office stating that his health insurance coverage would end effective September 30, 2016 and that the decision to terminate his insurance was made by then-Commissioner of Finance and Administration, Larry Martin, in consultation with the Attorney General. Durham's (and his family's) state health insurance coverage ended on September 30, 2016. The communication from Ridley's office did not provide any process for a hearing or for appealing the decision to terminate Durham's health insurance, either before or after the termination went into effect. (Doc. No. 33-2; *see also* Durham Decl. ¶ 27 & Ex. C, Doc. No. 72-1, at 21–24.)

Tennessee law provides that, "[u]pon retirement from the general assembly, any . . . representative . . . may elect to retain retiree health benefits by participating in the plan authorized by the state insurance committee." Tenn. Code Ann. § 8-27-208(a)(1) (2015). The provision only applies to officials first elected prior to July 1, 2015, and the statute expressly excludes any former member of the General Assembly who, after November 2, 2010, is convicted of a felony "arising out of that person's official capacity as a member of the general assembly." *Id.* § 8-27-208(a)(2), (b).

Durham has never been convicted of a felony. (Durham Decl. ¶ 2.) Accordingly, if he had retired after his first term expired in 2014, he would have been eligible to elect to retain retiree health benefits under Tenn. Code Ann. § 8-27-208. However, following his expulsion, the Commissioner of Commerce and Insurance, acting in his official capacity and in consultation with the Tennessee Attorney General, determined that Durham was not entitled to continued health insurance benefits, because he had not "retired" from the General Assembly.[5]

The plaintiff filed suit in August 2017, challenging his expulsion from the legislature and the termination of state benefits—a state pension as well as the lifetime health insurance benefit— on the grounds that the expulsion and denial of benefits violated his right to due process. (Doc. No. 1.) The defendants promptly filed their first Motion to Dismiss, arguing that Durham lacked standing to bring the case. This court granted the motion, but the Sixth Circuit reversed. *Durham v. Martin*, 287 F. Supp. 3d 683 (M.D. Tenn. 2017), *rev'd & remanded*, 905 F.3d 432 (6th Cir. 2018). Following remand, Durham filed his Amended Complaint, adding a new cause of action and new defendants. The court granted in part and denied in part the defendants' second Motion

---

[5] This court previously held as a matter of law that "expulsion" is not equivalent to retirement. *See Durham v. Martin* ("*Durham III*"), 388 F. Supp. 3d 919, 941 (M.D. Tenn. 2019), *aff'd sub nom. Durham v. McWhorter* ("*Durham IV*"), 789 F. App'x 533 (6th Cir. 2020).

to Dismiss, dismissing for failure to state a claim the plaintiff's new cause of action, which asserted that the decision to expel Durham from the legislature constituted an unconstitutional Bill of Attainder, and dismissing the claims against the new defendants as time-barred. The court also dismissed for failure to state a claim for which relief could be granted the plaintiff's claim pertaining to his right to a state pension. However, the court denied the motion to dismiss the plaintiff's claim for deprivation of a vested property right to continued health insurance coverage without due process of law, finding both that the claim was not barred by sovereign immunity and that it was not subject to dismissal for failure to state a claim for which relief could be granted. *Durham III*, 388 F. Supp. 3d at 942. The defendants appealed only on the basis that the claim was barred by sovereign immunity, but the Sixth Circuit affirmed. *Durham IV*, 789 F. App'x at 534.

The plaintiff now seeks summary judgment in his favor on the grounds that the material facts are undisputed and he is entitled to judgment as a matter of law. Specifically, he seeks only "the restoration of the vested property right" (Doc. No. 64-1, at 19), through an injunction reinstating his right to lifetime health insurance coverage for himself and his family that was terminated as a result of his expulsion from the legislature (*see also* Doc. No. 33, at 13). His motion (Doc. No. 64) is supported by a Memorandum of Law and Statement of Undisputed Material Facts (Doc. Nos. 64-1, 64-2). The remaining defendants—Butch Eley, Tennessee Commissioner of Finance and Administration, Connie Ridley, Director of Legislative Administration, and David H. Lillard, Jr., Treasurer of the State of Tennessee, in their official capacities only—oppose the motion. (Doc. No. 68.) Besides responding to the plaintiff's Statement, the defendants filed their own Supplemental Statement of Undisputed Material Facts. (Doc. Nos. 69–70.) The plaintiff has filed a Reply and a Response to the Supplemental Statement. (Doc. Nos. 72, 72.) Although the

facts are basically undisputed, both parties have filed evidentiary material, referenced herein as necessary.

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

## III.   DISCUSSION

### A.   Legal Standards

The plaintiff's claim is brought under 42 U.S.C. § 1983, for deprivation of his rights under the Fourteenth Amendment, which provides, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The due process clause has both procedural and substantive components, *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012), but the court has already construed the Amended Complaint as stating a claim for violation of the right to procedural due process. *Durham III*, 388 F. Supp. 3d at 937. "To establish a procedural due process claim, a plaintiff must show that (1)

[he] had a life, liberty, or property interest protected by the Due Process Clause; (2) [he] was deprived of this protected interest; and (3) the state did not afford [him] adequate procedural rights." *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014).

### B. Whether the Plaintiff Had a Constitutionally Protected Property Interest

An individual claiming to have a protected property interest "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]" *Id.*; *see also EJS Props.*, 698 F.3d at 855 ("Whether a person has a 'property' interest is traditionally a question of state law." (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982)). Thus, a legitimate claim of entitlement "must be grounded in some statute, rule, or policy," *Hughlett v. Romer–Sensky*, 497 F.3d 557, 567 (6th Cir. 2006), or express or implied contract. *Ludwig v. Bd. of Trs. of Ferris State Univ.*, 123 F.3d 404, 409 (6th Cir. 1997).

Based on these principles, the Supreme Court has found, for instance, that welfare benefits "are a matter of statutory entitlement for persons qualified to receive them" and that such entitlement cannot be terminated without a pretermination evidentiary hearing. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970). Similarly, a child cannot be "exclu[ded] from the educational process for more than a trivial period" without due process. *Goss v. Lopez*, 419 U.S. 565, 576 (1975). And state employees who, under state statute, can only be terminated for cause have a protected property interest in their employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985). Likewise, the Sixth Circuit has recognized that "[p]articipation in a public housing program is a property interest protected by due process" *Woods v. Willis*, 515 F. App'x 471, 478 (6th Cir. 2013) (citation omitted); that "a social security claimant has a property interest in benefits for which he or she hopes to qualify," *Hamby v. Neel*, 368 F.3d 549, 559 (6th Cir. 2004) (citing

*Flatford v. Chater*, 93 F.3d 1296, 1304 (6th Cir. 1996); and that, because "Medicaid is a program established by Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, . . . Plaintiffs likewise have a property interest in the TennCare coverage for which they hope to qualify," *id.* at 559. Based on the same principles, at least one court has concluded that a statutorily created entitlement to life-time health insurance for retired civil servants is a protected property right. *See Jackson v. Roslyn Bd. of Educ.*, 652 F. Supp. 2d 332, 343 (E.D.N.Y. 2009).

In this case, the defendants do not actually address the fact—or contest the proposition—that, pursuant to Tenn. Code Ann. § 8-27-208, Durham had "a legitimate claim of entitlement," *Roth*, 408 U.S. at 577, to continued participation in the health insurance plan "authorized by the state insurance committee," Tenn. Code Ann. § 8-27-208(a)(1), once he completed one full term as a legislator, at least up until his ouster from the legislature. The statute itself refers to this benefit as a "right to continue[d] coverage." *Id.* § 8-27-208(a)(2). Consequently, the court finds that the right to continued participation in the state's health insurance plan, created by state statute, gave rise to a legitimate claim of entitlement protected by the Due Process clause.

### C. The Right to Due Process

There is no dispute that the plaintiff was deprived of this interest when the defendants unilaterally notified him on September 26, 2016 that his insurance benefit would end effective September 30, 2016. "Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a [constitutionally protected] property or liberty interest." *Daily Servs.*, 756 F.3d at 904 (quoting *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005)).

The plaintiff points to three arenas in which he should have been, but was not, accorded adequate process. The first of these is the Attorney General's investigation, which led to the final Report that Durham had engaged in misconduct. The plaintiff does not explain the source of any

due process rights to which he might have been entitled in connection with that investigation, however, and he fully acknowledges that the failure to accord him "procedural due process related to the investigation . . . would have been moot . . . were it not for the legislature's subsequent actions." (Doc. No. 64-1, at 12.) Because the report, standing alone, did not have any effect on Durham's status as a legislator or his entitlement to insurance benefits and did not provide a basis for punitive action or criminal charges against him, the court concludes that Durham did not have any right to due process in connection with the Attorney General's investigation. *Accord Kolley v. Adult Protective Servs.*, 725 F.3d 581, 586–87 (6th Cir. 2013) (dismissing procedural due process claims against social workers and investigators because it was the juvenile court's duty, rather than the investigators', to provide notice and a hearing).

The true crux of the plaintiff's claim is that his expulsion from the state legislature was unconstitutional. To be clear, the plaintiff does not seek to vacate his ouster or to be reinstated to the 109th General Assembly, which no longer exists.[6] He nonetheless ties the termination of his insurance coverage right to an alleged constitutional violation suffered when he was expelled from the General Assembly in violation of state law and without adequate process. Specifically, he asserts that "[p]rocedural due process is owed to legislators who face expulsion" and that he "was denied notice and procedural due process when the House expelled him on the basis of the one-sided investigation he was given no opportunity to contest." (Doc. No. 64-1, at 12.)

This assertion, however appealing, is firmly negated by Supreme Court and Sixth Circuit precedent. The Supreme Court has stated that "public office is not property" protected by due

---

[6] Such relief, in any event, would be barred by sovereign immunity and the Eleventh Amendment. *See S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 509 (6th Cir. 2008) (the Eleventh Amendment bars all suits for retroactive relief against the State or state actors in their official capacity (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 103 (1984)).

process. *Taylor v. Beckham*, 178 U.S. 548, 576 (1900). Despite a passionate and persuasive dissent by Justice Harlan in that case, *see id.* at 602 (Harlan, J., dissenting) ("I am of opinion that, equally with tangible property that may be bought and sold in the market, an office—certainly one established by the Constitution of a state, to which office a salary is attached, and which cannot be abolished at the will of the legislature—is, in the highest sense, property of which the incumbent cannot be deprived arbitrarily in disregard of due process of law."), the Supreme Court has never backed away from that decision. *See, e.g.*, *Snowden v. Hughes*, 321 U.S. 1, 7 (1944) (reaffirming the holding in *Taylor* that "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause").

Although the Supreme Court's jurisprudence in the years after *Snowden* has substantially expanded the scope of property rights protected by the Fourteenth Amendment, the lower courts remain bound by the earlier decisions. *See Velez v. Levy*, 401 F.3d 75, 86–87 (2d Cir. 2005) ("We are mindful that, since *Taylor* and *Snowden* were decided, the Court has adopted a more expansive approach to identifying 'property' within the meaning of the 14th Amendment. But while intervening cases may cast a shadow over *Taylor* and *Snowden*, it is [the Supreme] Court's prerogative alone to overrule one of its precedents." (internal citations and quotation marks omitted)).[7] The Sixth Circuit, specifically, has continued to recognize that *Taylor* and *Snowden* are controlling. *See Moncier v. Haslam*, 570 F. App'x 553, 559 (6th Cir. 2014) ("Public office is

---

[7] While it seems perverse, and even absurd, to conclude that Durham could have a protected property interest in his health insurance benefit but not in his elected office, the relevant jurisprudence appears to support just such a conclusion. *See Taylor*, 178 U.S. at 599 (Harlan, J., dissenting) ("[The majority has] now adjudged, that the office in dispute is not 'property' within the meaning of the 14th Amendment. So that while we may inquire whether a citizen's land, worth $100, or his mules, have been taken from him by the legislative or judicial authorities of his state without due process of law, we may not inquire whether the legislative or judicial authorities of a state have, without due process of law, ousted one lawfully elected . . . .").

not property within the meaning of the Fourteenth Amendment." (quoting *Burks v. Perk*, 470 F.2d 163, 165 (6th Cir. 1972); citing *Snowden*, 321 U.S. at 7)).

This court, therefore, is bound by precedent to conclude that, however lacking in process Durham's ouster from the state legislature may have been, he did not have a property interest in his elected office protected by the Fourteenth Amendment, and the absence of process and even the violation of state law associated with his ouster cannot be said to have violated his Fourteenth Amendment right to procedural due process. Thus, to the extent Durham's due process claim hinges upon the denial of adequate pre-deprivation process in the course of his expulsion from the legislature, which led to the termination of his right to continued health insurance under the state plan, it fails on the merits.

This conclusion does not necessarily completely dispose of the plaintiff's claim, however. The question is whether the plaintiff can show that he was denied process to which he was due in connection with the termination of his health insurance benefit. With respect to that deprivation, the plaintiff asserts that the defendants denied him procedural due process at three distinct times: (1) when they failed to provide advance notice that his expulsion from the legislature might result in the termination of his health insurance benefit; (2) when they failed to provide him adequate notice and a meaningful pre-deprivation opportunity to contest the termination of his benefits after he had been expelled (*see* Doc. No. 64-1, at 15 ("Defendants gave Mr. Durham no time to contest their decision—they simply informed Mr. Durham that his health benefits would cease in four days. Defendants took the step of depriving Mr. Durham of his property right to health benefits without any hearing or process."); and (3) when they failed to inform him of the existence of any type of post-deprivation procedure he might pursue to contest the termination of health insurance benefits. (*See* Doc. No. 64-1, at 14–15.)

Regarding the first claim, the plaintiff's briefing does not incorporate any argument in support of his contention that the defendants were required to formally notify him, prior to his expulsion—which the defendants had no reason to expect—that his health insurance benefit would terminate if he was expelled from the legislature. Regardless, the plaintiff's actual position appears to be that he reasonably believed that expulsion would not affect his right to health insurance, based on a newspaper article in July 2016, quoting defendant Ridley as stating that "[a]ll members of the general assembly who are elected to serve a full term of office as a member of the general assembly are eligible to continue their health insurance by paying the appropriate premium amount." He alleges that, if he had known that his benefit could be terminated, he would have retired from the General Assembly rather than face expulsion. (Durham Decl. ¶ 28.)

On this point, the court first notes that there appears to be a disputed fact and/or an unresolved legal question as to whether mid-session resignation to avoid expulsion would have qualified as "retirement" for purposes of the statute. The defendants do not concede as much (*see* Def.'s Resp. to Stmt. Undisp. Fact, Doc. No. 69 ¶ 3 (conceding only that, if Durham had retired after the expiration of his first term in 2014, he would have been eligible to retain retiree benefit).) And neither party has addressed the legal aspects of the question. Moreover, the court has already determined that a statement by Ridley—or, more accurately, an alleged statement by Ridley as reported in a newspaper article—"cannot create a binding property interest if it is in fact contradicted by state law." *Durham III*, 388 F.3d at 940; *see id.* at 940–41 ("[R]epresentations and customs may not create a property right where they are contrary to an existing statute or regulation." (quoting *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 566 F. App'x 462, 468 (6th Cir. 2014)). In addition, even assuming that pre-expulsion resignation would have ensured Durham's continued entitlement to the health insurance benefit, the plaintiff's purported reliance

on hearsay appearing in a newspaper article, without making any further investigation or inquiry, was objectively unreasonable; he had an independent obligation to apprise himself of what the law actually said. The plaintiff cites to no authority in support of his suggestion that reliance on a newspaper article could give rise to a due process violation.

With respect to the plaintiff's claim regarding insufficient notice of post-deprivation remedies, "[f]or one hundred years, the Supreme Court has declared that a publicly available statute may be sufficient to provide such notice because individuals are presumptively charged with knowledge of such a statute." *Grayden v. Rhodes*, 345 F.3d 1225, 1239 (11th Cir. 2003) (citations omitted); *see City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999) (holding that "individualized notice of state-law remedies" of post-deprivation procedure was not required when those remedies "are established by published, generally available state statutes and case law"). In short, the defendants had no obligation to notify the plaintiff of the existence of the state's statutory or regulatory procedure for challenging the termination of his health insurance coverage.

The only question properly before the court, then, is whether the defendants were required to provide the plaintiff with adequate notice (more than four days) and a meaningful opportunity to contest the termination of his benefits after the expulsion.

### D.    What Process Was Due?

Generally, to comport with due process, a state must provide pre-deprivation procedures before taking property, regardless of the adequacy of its post-deprivation remedies. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990). And to determine the adequacy of the procedure accorded, courts apply the balancing test developed in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which requires the weighing of three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the

Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.[8]

Addressing these factors, Durham argues that he was afforded, at best, "abbreviated process" and that, under the first *Mathews* factor, his interest in lifetime health insurance benefits was a "substantial property interest" affected by the defendants' action. *Mathews*, 424 U.S. at 335. As for the second factor, the plaintiff asserts that the risk of erroneous deprivation through the procedures used was high, as he was never permitted to question the evidence against him that led to his ouster and the termination of his health insurance benefit, and there was no contested fact-finding process. He also contends that the probable value of additional or substitute procedural safeguards—specifically post-deprivation process—does not excuse the absence of pre-deprivation process, because, as the plaintiff states,

> [e]ven if Defendants were to hold a hearing and find factually for Mr. Durham, that would not undo the expulsion, which per Defendants' position and this Court's prior rulings, makes it legally necessary that Mr. Durham not receive benefits. In other words, there is no post-deprivation procedure that the state could provide that would restore Mr. Durham to the position he was in prior to the deprivation of due process.

(Doc. No. 64-1, at 16.) On the strength of this argument, he concludes that the second *Mathews* factor weighs in his favor as well. (*Id.*) As to the final factor, Durham maintains that the government's interest in denying him health insurance benefits is minimal in light of the fact that "every other person elected to the legislature who completes a full term" is entitled to such

---

[8] The failure to provide pre-deprivation process may, however, be excused under the so-called "*Parratt* doctrine," *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), "(1) the deprivation was unpredictable or 'random'; (2) predeprivation process was impossible or impracticable; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty." *Daily Servs.*, 756 F.3d at 907 (quoting *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)). However, in this case, the parties do not actually address the *Parratt* doctrine. The court therefore accepts the plaintiff's uncontested presumption that the *Parratt* doctrine is not implicated.

coverage and that no one would be harmed by extending him the same benefit and thus, that "there is no government interest to justify denying Mr. Durham due process." (*Id.* at 17.)

For their part, the defendants do not actually address the *Mathews* factors. Instead, they argue that, because he was expelled from the legislature, Durham no longer had a right to health insurance benefits and, as a result, no right to due process associated with the termination of that benefit. The court is not persuaded. The plaintiff had a protected property interest in continued health insurance benefits. He was accorded what would clearly constitute, at best, abbreviated process in connection with his expulsion from the legislature. Although, as set forth above, the House did not owe him any particular process, Durham did have a protected interest in the health insurance benefit. As a result, he was entitled to adequate process in connection with the termination of that benefit.[9]

Anticipating the possibility that the court might conclude as much, the defendants argue in the alternative that, even assuming that he was entitled to process, the plaintiff could have, but did not, avail himself of the state's post-deprivation process. Specifically, they contend that the plaintiff had multiple paths available under state law to challenge the Tennessee Benefits Administration's termination of his health insurance coverage. First, he could have pursued an appeal of that decision under Tenn. Code Ann. § 8-27-102. A decision rendered in such an appeal would then have been reviewable under the procedures outlined in the Tennessee Uniform Administrative Procedures Act ("APA"), Tenn. Code Ann. §§ 4-5-301 *et seq.* Under the APA, parties have the ability to conduct discovery and to present documentary evidence and witness

---

[9] Clearly, if the House had accorded Durham adequate notice and a contested hearing before ousting him from the legislature, that type of procedure, even though not required, would likely also have provided all the process to which Durham would have been entitled in association with the termination of his health insurance benefit as well.

testimony. *See* Tenn. Comp. R. & Regs. 1360-04-01-.11 & 1360-04-01-.16. Alternatively, Durham could have requested a declaratory order from the Benefits Administration under Tenn. Code Ann. § 4-5-223, which allows an "aggrieved party" to "petition an agency for a declaratory order as to the validity or applicability of a statute, rule or order within the primary jurisdiction of the agency." A declaratory order would then be reviewable by the Chancery Court and the Tennessee Court of Appeals, and the plaintiff, through this process, could have challenged "the agency's application of a statute or rule as unconstitutional" or "the constitutionality of the procedure used by an agency." *Colonial Pipeline v. Morgan*, 263 S.W.3d 827, 843 (Tenn. 2008). They argue that, because the state offered post-deprivation process of which the plaintiff failed to avail himself, the plaintiff's due process claim fails for this reason as well.

The defendants go on from there, however, to agree with the plaintiff's conclusion that any post-deprivation remedy would have been futile. The defendants specifically posit that, because the plaintiff had been expelled from the legislature, he did not qualify as a retiree, and, as a matter of state law, he was no longer entitled to continued health insurance coverage. (*See* Doc. No. 68, at 8 ("Plaintiff's expulsion set him on a collision course for denial of his retiree health benefits; so long as the expulsion is on the books, that is the only possible outcome under the statute.").) As set forth above, the plaintiff agrees: "[T]here is no post-deprivation procedure that the state could provide that would restore Mr. Durham to the position he was in prior to the deprivation of due process." (Doc. No. 64-1, at 16 (emphasis added).)

The plaintiff does not actually dispute the *availability* of the post-deprivation procedures identified by the defendants. Instead, he simply agrees with the defendants that pursuing the available post-deprivation remedies would have been futile. The court, however, does not agree. The plaintiff only contends that post-deprivation process would have been futile because he wants

the court to reinstate his benefits rather than simply award him the process he was denied, as discussed below. And the defendants assert that the process would have been futile on the basis that their interpretation of state law mandates that the plaintiff be denied continued health insurance coverage, no matter what recourse the plaintiff sought. But neither of these positions actually establishes—as a matter of either fact or law—that additional process would have been futile in this case. To establish the inadequacy of post-deprivation procedures, the plaintiff must actually *prove* that it would have been futile to pursue post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Ragland v. Comm'r N.J. Dep' of Corr.*, 717 F. App'x 175, 177 (3d Cir. 2017) ("[The] post-deprivation remedy must be 'meaningless or nonexistent' to be inadequate." (quoting *Hamlin v. Vaudenberg*, 95 F.3d 580, 585 (7th Cir. 1996)); *Barhite v. Trierweiler*, No. 2:13-cv-169, 2014 WL 5782638, at *9 (W.D. Mich. Nov. 6, 2014) ("[I]n order to satisfy due process, the post-deprivation remedy does not have to guarantee a successful outcome, nor is [it] required to provide relief equivalent to that available in a § 1983 action." (citing *Parratt*, 451 U.S. at 543–44)).

The parties' assertion in this case that post-deprivation process would have been futile is not proof; it is speculation. If Durham had pursued post-deprivation process, he would, at the very least, have had the ability to argue to several different decision-makers during that process that his ouster, and therefore his change in status, was illegal. He also could have argued to these different decision-makers that the interpretation of state law by *these* defendants is wrong. He has not shown that a finding in his favor on these issues would *not* have permitted state authorities to reinstate his *benefits*, even if they did not have the power to reinstate him to his elected *office*. *See Bohler v. City of Fairview*, No. 20-5016, 2020 WL 6483126, at *4 (6th Cir. Nov. 4, 2020) ("Bohler did not even request a postdeprivation hearing, making it difficult for him to show the hearing would have

been inadequate."); *Cole v. Warren Cty.*, No. 1:11-CV-00189-JHM, 2012 WL 1950419, at *8 (W.D. Ky. May 30, 2012) ("The Plaintiffs have not pursued any post-deprivation remedies and, therefore, cannot allege that their post-deprivation remedies were inadequate to remedy the deprivation.").

In sum, the court finds that the plaintiff has failed to establish, as a matter of fact or law, that a post-deprivation remedy would have been insufficient to excuse the absence of pre-deprivation process. He has not shown that the second *Mathews* factor weighs in his favor. Consequently, he also cannot show that additional or substitute procedural requirements would have been necessary, so the third factor, the government's interest, likewise does not weigh in favor of finding a due process violation. Weighing the *Mathews* factors, the court finds that the plaintiff has not established a violation of his due process rights and that he is not entitled to summary judgment in his favor.

### E. Alternatively: No Available Remedy

To be clear, aside from arguing that he was owed due process by the House before being kicked out of the legislature, the plaintiff does not argue that the provision of pre-deprivation process in his case would have made a difference to his claim for continued health insurance coverage. And, although he could have done so, the plaintiff does not request relief in the form of an injunction requiring the defendants to accord him pre-deprivation process he was denied prior to the termination of his health insurance benefit. He specifically contends, instead, that any additional process would have been futile.[10] At the same time, the plaintiff expressly recognizes that the ordinary remedy for a due process violation would be to issue an injunction requiring the

---

[10] For the same reasons as discussed above, the court is not convinced that the provision of pre-deprivation process would have been futile.

defendants to provide the requisite process. (*See* Doc. No. 64-1, at 17 ("In many instances, the remedy for a procedural due process violation is to provide the process that should have been provided.").) The court, even if it found a due process violation, would not grant relief that was not actually requested and which, instead, the plaintiff affirmatively disclaims.

The plaintiff maintains that, in this case, the appropriate remedy—"the only real remedy possible under these circumstances"—is an "injunction restoring his health benefits." (Doc. No. 64-1, at 17.) He argues that the court "cannot order that Mr. Durham be given process as a remedy because it would not address his injury." (*Id.*) This is because (1) "it is too late for the legislature to give him process, since it was adjourned four years ago and cannot be brought back into session" and (2) "any post-deprivation process provided by Defendants would necessarily be inadequate because, having been expelled (however improperly), Mr. Durham is unable to obtain benefits as a matter of state law." (*Id.* at 16–17.)

The plaintiff's argument is hopelessly circular. His due process claim related to the deprivation of his health insurance benefit is inextricably intertwined with his claim that he was entitled to due process before being expelled from the legislature. The cases upon which he relies confirm as much. First, he cites *McCarley v. Sanders*, 309 F. Supp. 8 (M.D. Ala. 1970), in which an Alabama district court ruled in favor of a state senator who brought suit claiming that his expulsion from the state legislature violated due process. The court vacated the expulsion, effectively reinstating him to the senate and awarding backpay (without addressing the question of sovereign immunity). *See id.* at 11–12. The court dismissed the defendants' contention, based on *Snowden* and *Taylor*, that the plaintiff did not have a property interest in his senate seat:

> [I]t is now well established that the State's interest must be balanced with the interests of the individual, and that a person may not be discharged or expelled from a state public office upon a ground involving criminal guilt, infamy, disgrace, or

other grave injury to the individual until after such notice and hearing as is requisite
to due process of law.

*McCarley*, 309 F. Supp. at 11 (citing *Wieman v. Updegraff*, 344 U.S. 183, 191, 192 (1952);

*Slochower v. Bd. of Higher Educ.*, 350 U.S. 551, 555, 556 (1956); *Cafeteria & Rest. Workers*

*Union v. McElroy*, 367 U.S. 886, 898 (1961)). None of the authority cited in *McCarley* concerned

*elected* officials, however, and, as set forth above, this court is bound by the Sixth Circuit's

determination that *Snowden* and *Taylor* remain good law.[11]

The plaintiff also relies on *Galbreath v. Hale County*, No. 15-308-CG-N, 2017 WL

3402964 (S.D. Ala. Aug. 8, 2017), which held that "reinstatement is an available remedy for a pre-

termination procedural due process violation." *Id.* at *2. It is presumably for that premise that the

plaintiff cites *Galbreath*, but the court there went on to hold that reinstatement as a remedy is

available "only where a tenured employee would not have been dismissed if his procedural due

process right had been observed." *Id.* at *3 (quoting *Hopkins v. Saunders*, 199 F.3d 968 (8th Cir.

2000)). By analogy, then, *Hopkins* and *Galbreath* indicate that reinstatement of Durham's benefit

in this case would be appropriate if the plaintiff could establish that he *would* have been entitled

to the benefit if he had been accorded due process. Here, the plaintiff asserts that he would not

have been ousted from the legislature if he had been accorded due process. But, to emphasize the

point, the court reiterates that Durham was not entitled to any kind of process in connection with

---

[11] The Fifth Circuit appears to be the only federal appellate court to have concluded that *Taylor* and *Snowden* are no longer binding. *See, e.g.*, *Gordon v. Leatherman*, 450 F.2d 562, 565 (5th Cir. 1971) (citing approvingly the district court's conclusion, but without reference to any other authority, that "[a] an elected official 'has a property right in his office which cannot be taken away except by due process of law'"); *see also Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir. 1979) ("An elected city official who is entitled to hold an office under state law has a property interest in his office which can be taken from him only by procedures meeting the requirements of due process." (citing *Gordon*, 450 F.2d at 565), and *Bishop v. Wood*, 426 U.S. 341 (1976), which involved the termination of a city police officer without a hearing).

the House's expelling him from his elected position. Further, he states that he would *not* have been entitled to reinstatement of his health insurance benefit if he had been accorded procedural rights in connection with that termination. He therefore cannot establish, based on *Hopkins* or *Galbreath*, that reinstatement is warranted. He seeks no other remedy and, therefore, would be entitled to none, even if he had established a due process violation.

**IV.    CONCLUSION**

For the reasons set forth herein, the plaintiff's Motion for Summary Judgment (Doc. No. 64) will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge